THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VIRGIL ARMSTRONG, | CASE NO. C18-0845-JCC |
| Plaintiff, | ORDER |
| v. | |
| DEPUTY C. WHALEN *et al.*, | |
| Defendants. | |

This matter comes before the Court on Defendants' motion for summary judgment (Dkt. No. 31). Having considered the parties' briefing and the relevant record, the Court hereby DENIES the motion for the reasons explained herein.

I.   **BACKGROUND**

On June 14, 2015, at around 1:00 a.m., Lindsey Korneliussen called 9-1-1 to report a noise complaint. (Dkt. No. 33 at 46.) Korneliussen told the 9-1-1 operator that she had heard "loud thumping" for 10 to 15 minutes coming from Plaintiff Virgil Armstrong's apartment upstairs. (*Id.*) Korneliussen also told the operator that it sounded like the person in the apartment was alone. (*Id.*) The operator dispatched Deputies Carl Whalen, Kore Oyetuga, and Chad Daugherty to investigate the noise complaint. (*Id.* at 2.)

The deputies were met by Korneliussen, who led them to Armstrong's apartment on the fifth floor. (*Id.*) Once they reached the fifth floor, the deputies heard "banging noises" and "what

sounded like a single, male individual inside [Armstrong's] apartment."[1] (*Id.* at 2–3.) Deputy Whalen proceeded to knock on Armstrong's door, stating, "Sherriff's Office, police. Come to the door." (*Id.* at 3.) Armstrong did not come to the door, but he "repeatedly said, 'I'm okay. Ok, I'm good.'" (Dkt. No. 34 at 2.) Eventually, Armstrong stopped responding to Deputy Whalen. (*Id.*)

Having been unable to talk with Armstrong or ascertain what was happening in his apartment, the deputies decided to ask nearby residents about Armstrong. (*See* Dkt. No. 33 at 3.) Those residents informed the deputies that Armstrong lived alone, which was "consistent with what [the deputies] could hear from outside of Armstrong's apartment: a single voice, and a single set of foot falls within the apartment." (*Id.*) Because Armstrong appeared to be alone, the deputies concluded that "the necessary exigent circumstances to forcibly enter the apartment to contact the occupant were not present at that time." (*See id.* at 33.) The deputies therefore returned to Korneliussen, explained that "there was little more [they] could do," and left. (*Id.*)

Armstrong claims that a short while after the deputies left, he woke up from what he believes was a "sleepwalking episode." (Dkt. No. 40 at 2.) When Armstrong tried to get out of bed, he felt a serious pain in his arms and legs. (*Id.*) He saw that they were bleeding and that his body had numerous cuts. (*Id.*) Realizing that these injuries were serious and that he needed medical assistance, Armstrong made his way to his living room and tried unsuccessfully to find his phone. (*Id.*) As he searched for the phone, Armstrong noticed that his fish tank had fallen from a shelf onto the floor. (*Id.*) According to Armstrong, "it was then that I realized that, after falling asleep, I . . . sleep-walked and accidentally bumped into my large glass fish tank . . . . Next, I must have fallen down . . . and cut/lacerated myself on the shards of broken glass." (*Id.*)

---

[1] Armstrong seems to say that he did not wake up until after the police first came to his apartment. (*See* Dkt. No. 40 at 2–3.) But Armstrong also speculates that he was sleepwalking before he woke up, and he does not deny communicating with the officers in his sleep. (*See id.*) It is, therefore, unclear whether Armstrong disputes the deputies' description of their first encounter outside of his door. (*See generally id.*) However, even if that description is accurate, the Court's decision would be the same. Accordingly, the Court will assume that the deputies' description is accurate for the sake of simplicity.

While still trying to process the situation, Armstrong opened his front door and called out for help. (*Id.*)

What happened next is vigorously disputed. Armstrong says that after the door closed, he sat down in his kitchen and never again cried for help. (*Id.*) Several minutes later, at least three deputies came into his apartment without knocking or announcing their presence. (*Id.* at 3.) Armstrong thought the deputies were there to rescue him, and he told them something like, "Thank God you're here to help. I'm f*&#@d up and I need help." (*Id.*) But the deputies "yell[ed] at [him] to get face down into the broken glass that was obviously visible on the floor." (*Id.*) At the same time, one of the deputies asked Armstrong whether there was someone else inside the apartment. (*Id.*) Almost as soon as Armstrong answered "no," all three deputies fired their tasers without warning. (*Id.*) The electricity from the tasers caused Armstrong to involuntarily jerk upright, fall face forward, and hit his closet door so hard it broke. (*Id.*) After firing their tasers, the deputies put Armstrong in handcuffs and drove him to the hospital. (*Id.* at 3–4.)

The deputies tell a different story. According to them, Deputies Whalen, Oyetuga, Daugherty, and Reserve Deputy Scontrino received a call at 2:31 a.m. that a male in the same apartment as before was screaming for help. (Dkt. No. 33 at 4.) When the deputies arrived at the apartment building, they called the fire department and asked the department to "stage themselves on scene in anticipation of transporting Mr. Armstrong to a local hospital." (*Id.* at 4.) The deputies then went to the fifth floor and knocked on Armstrong's door. (*Id.*) Although the man inside did not respond, he continued to call out, "help me, help me." (*Id.*) Hearing these cries for help, the deputies concluded that they had to go inside. (Dkt. No. 34 at 4.) They assumed "tactical positions." (*Id.*) Deputies Whalen and Daugherty drew their firearms. (*Id.*) Deputy Oyetuga drew his taser. (*Id.*) Deputy Scontrino drew neither. (*Id.*) Deputy Daugherty opened the door, and Deputy Whalen stepped through. (*Id.*)

Deputy Whalen was greeted by a disturbing sight. (*Id.*). Armstrong sat six to seven feet

away in boxer shorts. (*Id.*) His body was "covered in slick blood from head to toe." (*Id.*) He had "deep wounds on his leg to the extent that bone was visible." (*Id.*) And "[h]e was playing with a flap of skin on his leg[,] moving the skin back and forth along what appeared to be his exposed bone." (*Id.* at 4–5.) Blood was also smeared all over the apartment, and the furniture was broken into pieces. (*Id.* at 5.)

Deputy Whalen identified himself as a deputy and said that he was there to help. (*Id.*) Deputy Whalen then told Armstrong to roll onto his belly. (*Id.*) Armstrong responded, "Fuck you, I'm not a dog." (*Id.*) Deputy Daugherty asked Armstrong if there was anyone else in the apartment, but Armstrong did not answer. (*Id.*)

Deputy Whalen repeated his command that Armstrong roll over onto his belly, explaining, "We can't help you until we make the scene safe, we need to make sure everything's okay, get on your belly so aid can come up to help." (*Id.*) Deputy Whalen's command seemed to anger Armstrong, who said, "why aren't you helping me?" (*See id.*) Armstrong proceeded to stand up and start walking toward the deputies—even though it appeared that "he was missing a chunk of his Achilles." (*Id.*)

Deputy Whalen told Armstrong to stop or he would be tased. (*Id.*) Armstrong did not stop, so Deputy Whalen deployed his taser in probe mode. (*Id.*) It had no effect. (*Id.* at 5–6.) Seeing this, Deputy Oyetuga deployed his own taser in probe mode, which either missed or had no effect. (*See id.* at 6; Dkt. No. 33 at 5–6.) Deputy Oyetuga tried to deploy his taser a second time. (Dkt. No. 34 at 6.) Once again, the taser did not stop Armstrong. (*See id.*) Finally, Deputy Daugherty fired his taser, causing Armstrong to fall. (*See* Dkt. No. 33 at 6.) Armstrong said "something like, 'I'm done, I give up,'" (*id.*), or "I'm good, I'm good, okay, okay," (Dkt. No. 34 at 6).

With Armstrong subdued, Deputy Whalen moved in and handcuffed Armstrong. (Dkt. No. 33 at 6.) The deputies then radioed for the medics stationed outside to come upstairs. (*Id.*) The medics triaged Armstrong's injuries, placed him on a gurney, took him outside to an

ambulance, and drove him to the hospital. (*Id.*)

What happened at the hospital is also disputed. Armstrong claims that the deputies were present at the hospital and that "they wrongly and intentionally misidentified [him] as posing a risk of imminent danger to [himself] and others." (Dkt. No. 40 at 4.) Armstrong further claims that the deputies' inaccurate and false statements caused the hospital staff to lock him up on an involuntary hold for 72 hours. (*Id.* at 5.) The deputies, however, say that they were not even at the hospital. (Dkt. Nos. 33 at 6–7, 34 at 7, 35 at 9, 36 at 5.)

On June 11, 2018, Armstrong filed a complaint against Deputy Whalen, Deputy Daugherty, Deputy Oyetuga, Ty Trenary, and Snohomish County. (Dkt. No. 1 at 1.) The complaint brings claims under 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134; and Washington's law against civil conspiracy. (*See id.* at 12–20.) Defendants now move for summary judgment dismissal of Armstrong's § 1983 and Title II claims.[2] (*See generally* Dkt. No. 31.)

## II.  DISCUSSION

### A.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In deciding whether there is a genuine dispute of material fact, the court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party.

---

[2] Defendants' motion does not address Armstrong's civil conspiracy claims. (*See generally* Dkt. No. 31.) But for reasons that are unclear, Armstrong discusses those claims in his response. (*See* Dkt. No. 39 at 39.) This prompted Defendants to briefly argue in their reply that "Plaintiff's state tort claim for civil conspiracy fails because there is no evidence of unlawful purpose or unlawful means." (Dkt. No. 42 at 11.) The Court will not consider this argument because it is underdeveloped by both parties and was not in Defendants' motion for summary judgment.

*Id.* at 255. The court is therefore prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

"The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But once the moving party properly supports its motion, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**B.    42 U.S.C. § 1983 Claim Against Deputies Whalen, Oyetuga, and Daugherty**

Defendants move for summary judgment on the excessive force claims against Deputies Whalen, Oyetuga, and Daugherty in their individual capacities, arguing that the deputies are immune from personal liability under the doctrine of qualified immunity. (*See* Dkt. No. 31 at 9–19.) "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To decide whether an officer has qualified immunity, a court engages in a two-pronged inquiry. Under the first prong, the court must decide "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right." *Tolan*, 572 U.S. at 655–67 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (alterations in original). Under the second prong, the court must determine "whether the right in question was 'clearly established'

at the time of the violation." *Id.* at 656.

### 1. Whether the Deputies Violated a Federal Right

Armstrong alleges that the deputies violated his Fourth Amendment rights by using excessive force on June 14, 2015. (*See* Dkt. No. 1 at 12.) "Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable searches and seizures." *Bryan v. MacPherson*, 530 F.3d 805, 823 (9th Cir. 2010). The reasonableness of a seizure depends on the balance between "the nature and quality of the intrusion on the individual's Fourth Amendment interests" and "the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In this case, the deputies had little interest in using significant force against an injured man who was allegedly pleading for their help. The deputies' use of force was therefore unreasonable when viewed in the light most favorable to Armstrong.

#### i. *Nature and Quality of the Intrusion*

The parties agree that Deputies Whalen, Oyetuga, and Daugherty used their tasers against Armstrong in dart mode. (*See* Dkt. Nos. 33 at 5–6, 40 at 3.) When used in dart mode, tasers inflict pain that "is intense, is felt throughout the body, and is administered by effectively commandeering the victim's muscles and nerves." *Bryan*, 630 F.3d at 825. The intense pain and resulting loss of muscle control can also cause a fall resulting in serious injuries. *Id.* Recognizing this potential for harm, the Ninth Circuit has held that using a taser in dart mode "constitute[s] an intermediate, significant level of force that must be justified by the governmental interest involved.'" *Id.* at 826.

#### ii. *Governmental Interest in the Use of Force*

In *Graham v. Connor*, 490 U.S. 386, 396 (1989), the Supreme Court instructed courts to evaluate the Government's interest in the use of force by examining three core factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." These factors are not exclusive, however, and courts must "examine the totality of the

circumstances and consider 'whatever specific factors may be appropriate in a particular case.'" *Bryan*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Viewed in the light most favorable to Armstrong, the totality of the circumstances show that the Government had minimal—if any—interest in using force against Armstrong.

To begin with, if Armstrong's account is accurate, then he posed no immediate threat to the safety of the deputies or others. Armstrong was unarmed, which the deputies could see because he wore only boxers. *See Bryan*, 530 F.3d at 826 (concluding it "should have been apparent" that the plaintiff was unarmed because he was "only dressed in tennis shoes and boxer shorts"); (Dkt. No. 34 at 4). Armstrong also needed immediate medical attention—a fact made apparent by the gaping wounds all over Armstrong's body. (*See* Dkt. No. 34 at 4–5.) And while Armstrong was only six or seven feet away from the deputies, (*id.* at 4), he was seated, (*id.*), claims that he made no movement towards the deputies, (Dkt. No. 40 at 4), and says that he was pleading for the deputies to help him, (*id.* at 3). An unarmed, seated, and gravely wounded individual who is pleading for help needs an ambulance, not a taser.

In addition to posing no immediate threat, Armstrong was not suspected of a serious crime. When the deputies first came to Armstrong's apartment, they were responding to a noise complaint. (Dkt. No. 33 at 2.) When the deputies came a second time, they were responding to a report that a man was calling for help. (*Id.* at 4.) These circumstances significantly reduce the Government's interest in using even a moderate level of force. *See Mattos v. Agarano*, 661 F.3d 433, 449, 450 (9th Cir. 2011) (concluding an officer had little interest in tasing a woman who the officer was called to protect against her allegedly abusive husband); *Bryan*, 630 F.3d at 702 (finding a suspect's minor traffic violation did not support an officer's use of a taser).

Defendants claim that the deputies' use of force was reasonable because Armstrong's "failure to follow the commands to get face down on the floor delayed the deputies' ability to search for other victims or suspects." (*See* Dkt. No. 42 at 5.) But "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone,

1  justifies the use of force that may cause serious injury." *See Bryan*, 630 F.3d at 826 (quoting
2  *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). Moreover, the deputies had little
3  reason to believe that there were other victims or suspects in the apartment: residents had told the
4  deputies that Armstrong lived alone, and the deputies had heard only "a single voice, and a single
5  set of foot falls within the apartment." (*See* Dkt No. 33 at 3.) Furthermore, even if the deputies
6  had good reason to secure the scene, it was unreasonable for them to command that Armstrong
7  "get face down into the broken glass that was obviously visible on the floor." (Dkt. No. 40 at 3.)
8  Armstrong was more than justified in refusing that command—especially if Armstrong is correct
9  that he was never warned that the deputies would tase him for failing to comply. *See Bryan*, 630
10 F.3d at 831 (holding officer's use of force was unreasonable because, among other things, the
11 officer failed to warn the suspect that the suspect would be tased if he did not comply with the
12 officer's commands); (Dkt. No. 40 at 3).

13              *iii.*     *Balance of the Interests*

14        The Government's minimal interest in using force against Armstrong cannot justify the
15 significant level of force that the deputies used. Armstrong was sitting unarmed. (Dkt. No. 34 at
16 4.) Armstrong says he never threatened the deputies or moved towards them; instead, he pleaded
17 with the deputies for help. (Dkt. No. 40 at 3–4.) Yet the deputies purportedly ignored
18 Armstrong's pleas and ordered him to lie face down on broken glass. (*Id.* at 3.) When Armstrong
19 did not immediately comply with that order, the deputies allegedly tased him without warning.
20 (*Id.*) Those alleged actions were unreasonable.

21              2.     <u>Whether the Federal Right Was Clearly Established</u>

22        Having determined that that the deputies used unreasonable force if the facts are viewed
23 in the light most favorable to Armstrong, the Court must decide whether the deputies "violate[d]
24 clearly established statutory or constitutional rights of which a reasonable person would have
25 known." *Harlow*, 457 U.S. at 818. When viewed in that same favorable light, the facts show that
26 the deputies violated several key principles that were clearly established by *Bryan v.*

*MacPherson*, 630 F.3d 805 (9th Cir. 2010), and *Mattos v. Agarano*, 651 F.3d 433 (9th Cir. 2011)—two cases where the Ninth Circuit held that an officer's use of a taser was unreasonable.

First, the deputies used significant force against an unarmed person who, according to Armstrong, never threatened anyone. (*See* Dkt. No. 40 at 3–4.) In *Bryan*, the Ninth Circuit emphasized that Carl Bryan was unarmed, that he never physically or verbally threatened Officer Brian MacPherson, and that Bryan never moved towards Officer MacPherson. 630 F.3d at 826–27. Likewise, in *Mattos*, the Ninth Circuit stressed that Malaika Brooks and Jayzel Mattos never threatened anyone. 661 F.3d at 444–46, 449 (observing that the most important *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others). The same is true of Armstrong: rather than threatening the deputies, he allegedly asked them for help. (*See* Dkt. No. 40 at 3–4.)

Second, the deputies tased a person that they were ostensibly there to assist. In *Mattos*, the Ninth Circuit acknowledged that Officer Ryan Aikala faced a potentially dangerous situation; he was responding to a domestic violence dispute, and the allegedly abusive husband was "hostile, seemingly intoxicated, six feet three inches tall and approximately 200 pounds." 661 F.3d at 450–51. But the Ninth Circuit concluded that Officer Aikala should have diffused the situation without tasing the woman he was there to protect. *See id.* Similarly, the deputies in this case should have secured the scene without tasing Armstrong, the man whom they were supposed to be helping.

Finally, the deputies purportedly failed to warn Armstrong that he might be tased. (Dkt. No. 40 at 3.) In both *Bryan* and *Mattos*, the Ninth Circuit strongly condemned officers for using their tasers without giving any warnings. *See Bryan*, 630 F.3d at 831; *Mattos*, 661 F.3d at 451 ("[T]he fact that Aikala gave no warning to Jayzel before tasing her pushes this use of force *far beyond the pale*.") (emphasis added). The deputies should have heeded the Ninth Circuit's words and, at the very least, warned Armstrong before tasing him. Armstrong claims that they did not. (Dkt. No. 40 at 3.)

These are but some of the similarities between the deputies' alleged actions in this case and the officers' actions in *Bryan* and *Mattos*. Of course, there are also differences. In *Bryan*, for example, Officer MacPherson was 15 to 25 feet away from the man he tased, whereas the deputies were six to seven feet away from Armstrong. *Compare* 630 F.3d at 827, *with* (Dkt. No. 34 at 4). Yet, the Supreme Court has emphasized that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). After all, "[i]f qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Mattos*, 661 F.3d at 442. Moreover, the circumstances Armstrong describes are not novel in a meaningful sense: the deputies faced a tense situation, but Armstrong says that he never threatened them in any way; the deputies were there to help Armstrong, not arrest him; and the deputies allegedly failed to warn Armstrong that he might be tased. (*See* Dkt. No. 40 at 3–4.) Under those circumstances, the deputies violated clearly established law. The Court therefore DENIES Defendants' motion for summary judgment as to Armstrong's § 1983 claims against the deputies in their individual capacities.

The Court emphasizes that its decision to deny summary judgment stems from the "general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 572 U.S. at 656 (quoting *Anderson*, 477 U.S. at 249). While Armstrong's account raises a genuine issue for trial, that account is disputed by the deputies, who describe an entirely different version of events that is supported, at least to some extent, by the photographs of Armstrong's apartment taken after his encounter with the deputies. (*See* Dkt. No. 35 at 12–21.) This dispute must be resolved by a jury, and the Court does not endorse either parties' description of their encounter in denying summary judgment.

**C.     Immunity Under Wash. Rev. Code § 71.05.120**

Defendants argue that Wash. Rev. Code § 71.05.120 renders them "[i]mmune [f]rom

[l]iability," but it is unclear which claim Defendants are referring to. (*See* Dkt. No. 31 at 19.) Defendants cannot be referring to Armstrong's § 1983 claims: "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law." *Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) (quoting *Hampton v. Chicago*, 484 F.2d 602, 607 (7th Cir. 1973)). Defendants also cannot be referring Armstrong's claim under Title II, which is a federal statute whose reach is limited only by the United States Constitution. *See* U.S. Const. Art. IV., cl. 2. And Defendants do not seem to be referring to any state law negligence claims, as no such claims appear in Armstrong's complaint. (*See* Dkt. No. 1 at 12–20.) The Court therefore DENIES Defendants' motion for summary judgment as to the issue of immunity under Wash. Rev. Code § 71.05.120. That statute does not appear relevant to any of the claims at issue in this case.

### D. 42 U.S.C. § 1983 Claim Against Snohomish County

Defendants move for summary judgment on Armstrong's § 1983 claim against Snohomish County. Municipal entities like Snohomish County may be sued under § 1983. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Tanner v. Heise*, 879 F.2d 572, 582 (9th Cir. 1989). However, a municipal entity is not vicariously liable for the acts of its employees; it must "cause" the plaintiff's injury. *Monell*, 436 U.S. at 694; *Tanner*, 879 F.2d at 582. A municipality can cause a plaintiff's injury in "one of three ways." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). First, the municipality's employee might commit a constitutional violation while acting pursuant to a municipal policy, practice, or custom. *Id.* The plaintiff can prove that such a policy exists by showing that the municipality routinely failed to investigate and discipline employees when they violated the constitution or failed to properly train those employees not to do so. *See Hunter v. County of Sacramento*, 652 F.3d 1225, 1233–34 & n.8 (9th Cir. 2011). Second, an employee endowed with "final policy-making" authority might violate the plaintiff's rights in such a way that the employee's action constitutes an act of official governmental policy. *Gillette*, 979 F.2d at 1346. Third, "an official with final policy-

making authority [might] ratif[y] a subordinate's unconstitutional decision or action and the basis for it." *Id.*

Here, Armstrong alleges that the deputies acted pursuant to a policy, practice, or custom of Snohomish County in that (1) Snohomish County failed to investigate and discipline employees who used excessive, non-lethal force and (2) Snohomish County failed to properly train its employees in the use of non-lethal force against individuals like Armstrong. (*See* Dkt. No. 1 at 15–16.) Armstrong's allegations state a plausible claim for municipal liability. *See Hunter*, 652 F.3d at 1233–34 & n.8. To prove that claim, Armstrong intends to conduct discovery regarding Snohomish County's allegedly unconstitutional policies and customs. (*See* Dkt. No. 39 at 18.) Because that discovery is still ongoing, Defendants' motion is premature. *See* Fed. R. Civ. P. 56(d); (Dkt. No. 58) (setting the discovery deadline for December 7, 2020). Accordingly, the Court DENIES without prejudice Defendants' motion for summary judgment as to Armstrong's § 1983 claim against Snohomish County. Defendants may renew their motion when further discovery is complete.

### E. Title II Claim

Defendants argue that they are entitled to qualified immunity against Armstrong's claim under Title II. (*See* Dkt. No. 31 at 22–24.) However, qualified immunity does not apply to Title II claims because qualified immunity is a defense afforded to officials sued in their individual capacities and Title II authorizes suits against "public entit[ies]," not individuals.[3] *See* 42 U.S.C. § 12131(1); *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000); *Trujillo v. Rio Arriba County*,

---

[3] Armstrong's complaint appears to allege a Title II claim against both Snohomish County and the deputies, but the complaint does not specify whether the claim is against the deputies in their individual or official capacities. (*See* Dkt. No. 1 at 17–18.) The parties are encouraged to address in future briefing whether Armstrong alleges a Title II claim against the deputies in their individual capacities and, if so, whether such a claim is appropriate. *See MacCool v. Arizona*, 2014 WL 1895444, slip op. at 7 (D. Ariz. 2014) (citing *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002)) ("[I]ndividuals may *only* be sued under the ADA in their official, rather than their individual capacities.").

2016 WL 4035340, slip op. at 8, 12 (D.N.M. 2016).

Defendants also seem to argue that Armstrong's Title II claim fails on the merits. (*See* Dkt. No. 31 at 24.) But that argument is underdeveloped because Defendants spend most of their brief discussing the inapplicable defense of qualified immunity. (*See id.* at 21–24.) It would also be premature for the Court to decide the merits of Armstrong's Title II claim because discovery is still ongoing. *See* Fed. R. Civ. P. 56(d). The Court therefore DENIES without prejudice Defendants' motion for summary judgment as to Armstrong's Title II claim. Defendants may renew their motion when further discovery is complete.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment (Dkt. No. 31).

DATED this 5th day of June 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE